IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION


WILLIAM BOYCE MCCULLOUGH                                          PLAINTIFF

V.                                                    CIVIL ACTION NO.1:18-CV-71-DAS

COMMISSIONER OF
THE SOCIAL SECURITY ADMINISTRATION                               DEFENDANT

<u>MEMORANDUM OPINION</u>

William Boyce McCullough seeks judicial review pursuant to 42 U.S.C. § 405(g), of the

decision of the Commissioner of Social Security ("Commissioner") denying his application for

disability insurance benefits.  The parties have consented to have the magistrate judge decide any

motions, conduct any hearings and enter judgment in this case, with any appeal direct to the Fifth

Circuit Court of Appeals.  Presently before the court is the Commissioner's motion to remand the

case for further administrative proceedings.  The plaintiff urges the court to reverse the decision

and award benefits.  In this opinion, the court refers to a reversal with remand for further

administrative proceedings as a remand, and a reversal with a judgment awarding benefits as a

reversal.

The court, after considering the motion, responses and briefs, finds that the motion to

remand for further administrative proceedings should be denied.  The decision of the

Commissioner is reversed and benefits shall be awarded, with remand only for the calculation of

benefits.

1. <u>PROCEDURAL HISTORY</u>

This is the plaintiff's second judicial appeal of the Commissioner's denial of disability

benefits.  McCullough, filed an application for social security disability benefits on September

1

21, 2012, alleging onset of disability beginning on January 1, 2009. McCullough's date last insured (DLI) is March 31, 2009. Because this case involves a claim for disability insurance benefits (DIB), but not supplemental security income, there must be proof that McCullough was disabled not later than the end of March 2009, before his insured status expired. *McLendon v. Barnhart*, 184 F. Appx. 430, 431 (5th Cir. 2006).

The application was denied initially and on reconsideration. On March 14, 2013, McCullough requested a hearing. More than a year later, on September 14, 2014, the Administrative Law Judge (ALJ) held the first hearing. The ALJ found McCullough failed to prove he was disabled before his DLI. In spite of medical proof of some long-term right-sided spasticity and weakness secondary to a stroke in 1996 and a later serious left leg injury in 2006, the ALJ found the plaintiff had no severe impairments at Step Two. The ALJ ignored medical evidence of McCullough's cognitive limitations, not even mentioning its existence. Testing by Dr. Brian Thomas, a neuropsychologist, showed McCullough's full-scale IQ was only 62. Thomas opined, based on his testing and evaluation of McCullough, and history from his cousin, Mary Adcock, that his work history was likely primarily attributable to the accommodation provided to him while working for the family business. The Appeals Council affirmed the ALJ's decision on March 4, 2015. On April 29, 2015, the plaintiff filed his first appeal, more than three years after the initial application.

In the first appeal, in Civil Action No. 1:15-cv-80-DAS, after the plaintiff filed his brief, the Commissioner, confessing error in the failure of the ALJ to consider or discuss the medical evidence of McCullough's cognitive difficulties, moved to remand for further proceedings. Its motion to remand was granted on the day the motion was filed—November 5, 2015.

After remand, the Appeals Council directed the ALJ to consider all evidence in the record, including Dr. Thomas' report and the report of Dr. Joe Edward Morris which had been

submitted to the Appeals Counsel and showed that McCullough had a full-scale IQ of 52. The Appeals Council noted that the later testing and diagnosis should be considered because it could indicate impairment prior to the DLI.

A second hearing was scheduled for September 29, 2016. The ALJ issued a decision on October 31, 2016, again finding that McCullough was not disabled. He found that the record failed to establish that McCullough had any severe cognitive impairments prior to the DLI. In an unusually long delay, the Appeals Council affirmed the latest decision on April 5, 2018. The plaintiff filed this action on April 19, 2018.

In a repetition of the first appeal, the plaintiff filed his brief, and the Commissioner, yet again, has moved to remand the case for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). This motion confesses prejudicial error in the administrative proceedings, though this time the Commissioner fails to specify the error or errors confessed.

This time, the plaintiff opposes the motion to remand, instead asking the court to reverse and render the Commissioner's decision and order the award of benefits. The plaintiff argues the evidence in the record, including the reports from the examining psychologists, clearly establish that he meets the Listings applicable to intellectual disability at step three, specifically 20 C.F.R. Pt. 404, Subpt. P. App, 1 § 12.05. He urges the court that a further remand for a third set of administrative proceedings will only serve to unduly delay his receipt of benefits.

In support of the motion to remand, the Commissioner argues that the record evidence does not conclusively establish McCullough's disability as of his date last insured and additional fact determinations reserved to the Commissioner need to be made, necessitating further administrative proceedings.

## 2. <u>STANDARD OF REVIEW</u>

A claimant has the burden of proving he suffers from a disability, which the Social Security Act defines as a mental or physical impairment, or combination of impairments, that precludes the claimant from any substantial gainful employment, and that is expected to result in death or that has, or is expected, to last least one year.  42 U.S.C. § 216 (i) and 223 (d).  In determining disability, the Commissioner, through the ALJ, works through a five-step sequential process.  *See*, 20 C.F.R. § 404.1520 (2012).

The burden rests on the claimant throughout the first four steps of this five-step process to prove disability.  If the claimant is successful in sustaining the burden at each of the first four levels, the burden then shifts to the Commissioner at step five.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b) (2012).

Second, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities...."  20 C.F.R. § 404.1520(c)(2012).  An impairment is not severe "only if it is a slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience" *Stone v. Heckler,* 752 F.2d 1099 (5th Cir. 1985).

At step three the ALJ must conclude the claimant is disabled if he proves that his impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, § § 1.00-114.02 (2011).  If a claimant's impairment meets certain criteria, then claimant's impairments are of such severity that they would prevent any person

from performing substantial gainful activity.  20 C.F.R. § 404.1525 (2012).  *Mershel v Heckler*, 577 F. Supp. 1400, 1405, n.15 (S.D.N.Y. 1984) (The Listing of Impairments … does not provide the exclusive definition of disability under the Act; it provides only a catalogue of 'automatic' disabilities.")

Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and/or mental demands of his past relevant work.  20 C.F.R. § 404.1520(f) (2012).  If the claimant is successful at all four of the preceding steps, the burden then shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he is capable of performing other work.   20 C.F.R. § 404.1520(g)(1) (2012).

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he cannot, in fact, perform that work.  *Muse*, 925 F.2d at 789.

This court's review of the Commissioner's decision is limited to an inquiry into whether there is 'substantial evidence, on the record as a whole, to support the findings of the Commissioner, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and whether the correct legal standards were applied.  42 U.S.C. § 405 (g); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Substantial evidence has been defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).  The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible

choices' or 'no contrary medical evidence.'" *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner, *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988), even if it finds that the evidence preponderates against the Commissioner's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994); *Harrell*, 862 F.2d at 475.

The court must, however, "scrutinize the record in its entirety to determine the reasonableness of the decision ... and whether substantial evidence exists to support it." *Randall v. Sullivan,* 956 F.2d 105, 109 (5th Cir. 1992*)*. In assessing the administrative evidence, the court looks to all evidence in the record. There is a notable difference between "substantial evidence" and substantial evidence on the record as a whole." *Jackson v. Hartford Accident and Indemnity Co.,* 422 F.2d 1272, 1277 (8th Cir. 1970). Looking to see if there is "substantial evidence on the record as a whole" involves more scrutiny. "The substantiality of evidence must take into account whatever evidence in the record fairly detracts from its weight." *Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 488 (1951). If the Commissioner's decision is supported by the substantial evidence on the record as a whole and does not show an error of law, then it is a conclusive and must be upheld. *Richardson*, 402 U.S. at 390.

3.  SYNOPSIS OF THE RECORD

A)  PLAINTIFF'S WORK AND EDUCATIONAL HISTORY

There is some confusion in the record about McCullough's educational and work record. McCullough, who was born on December 23, 1961, reported at different times that he dropped out of high school; graduated high school; or attended and obtained a degree from a community college. He testified at the first hearing that he dropped out of school in the tenth grade because he was unable to get along with others. McCullough reported to one of the examining psychologists that he had been placed in special education classes in the fourth and fifth grades, though elsewhere in the record it is reported that he attended special education classes for four years through 1972. Two of McCullough's cousins, Mary Adcock and Glenn McCullough, Jr., provided affidavits stating McCullough dropped out of high school and his attendance at the community college was for the purposes of obtaining a GED, which he may have obtained. They attributed the erroneous report as a symptom of his mental limitations.

All of McCullough's work experience has been doing unskilled, manual labor. The bulk of that work was as a laborer at family owned businesses for about seventeen years. McCullough claimed he was never fired from any job. Mary Adcock testified to McCullough's limited abilities to do even the simplest tasks at the family-business; to multiple serious disruptions caused by his inability to work with others, including family-member supervisors; and his family's attempts to accommodate him by moving him around to different jobs within the company. She said the family ultimately fired him anyway, and would have done so sooner, but for the family relationship.

His other work experience was as a stage hand and helper setting up for special events and concerts, loading and unloading equipment. He had three months of performing some light

janitorial work in 2008.  McCullough's description of that janitorial job because of very light demands, is consistent with a sheltered, rather than a competitive job.  His wage records also show multiple, very short-term jobs, after he was fired from the family business and before his last work in 2008.

### B  MEDICAL EVIDENCE

#### Physical Impairments

The plaintiff suffers from physical, as well as cognitive impairments.  His primary physical impairments are right-sided spasticity as a result of a stroke he suffered in 1996 and was treated for in 1997.   McCullough also suffered a severe friction burn to his left lower leg in 2006, which took months to heal.    For the purposes of this decision, a detailed exposition of these records is unnecessary.   It is important to note that his treating neurologist never mentions any cognitive or other impact secondary to the cerebrovascular event, other than right-sided spasticity and weakness in his right upper and lower extremities.    It is also significant that the ALJ, in his second decision, correcting one of his earlier errors, determined that McCullough's physical problems were severe impairments at step two, and further found that he had significant physical limitations secondary to the stroke and leg injury when assessing residual functional capacity.

#### ii. Cognitive and Adaptive Deficits

McCullough's claimed cognitive disorders and adaptive difficulties are set out in his testimony, the testimony of his cousin, Mary Adcock, her affidavit, and the affidavit of another cousin, Glenn McCullough, Jr., and the evaluations by the two examining psychologists.

(a) <u>Reports of Dr. Brian Thomas</u>

Dr. Thomas, a neuropsychologist examined McCullough on May 5, 2013, finding evidence of mental retardation.  McCullough, the only historian at the examination, reported no family history of mental retardation or mental illness.  He reported that he attended special education in the fourth and fifth grades, but never repeated a grade.  He explained that he worked as a stage hand at Cole Entertainment on an as-needed basis.  His primary employment was doing clean up and truck loading and unloading for the family business.  McCullough claimed he had never been fired or arrested, nor used drugs or alcohol.  He reported right-sided weakness from an earlier stroke.  McCullough told Thomas he lived alone and had basic and advanced activities of daily living including driving, cooking, taking medications, managing his finances, reading, using a telephone and scheduling and keeping appointments.  He also reported that he had not received any mental health treatment.

Thomas found him to be talkative and "almost tangential" in his speech at times.  He did not appear to be depressed or anxious.  His remote and recent memory appeared to be adequate.  His WAIS-IV full scale IQ was 62.   He was slow to respond during testing. The IQ and achievement test results were felt to accurately reflect his current level of intellect and achievement.  The diagnostic impression was mild mental retardation versus cognitive disorder not otherwise specified.  Thomas suggested that his intellectual functioning might have been worsened either by the history of meningitis or stroke, suggesting that a review of educational records and medical records might resolve diagnostic issues.[1]  Thomas opined that despite his

---

[1]  Here it is pertinent to note that the history of meningitis is from childhood and if it is the cause of intellectual disability would establish childhood onset.  Additionally, the medical records prove the stroke did not cause any intellectual decline.

reported activities of daily living (ADLS), his work history had most likely been made possible because of his family's "substantial support and assistance" and flexible work schedules at other work. Thomas opined, given his intellectual and achievement skills, "he would have great difficulty maintaining a full-time job in a consistent and persistent fashion." He did note McCullough did not appear to have any major psychiatric disorder.

Thomas provided a supplemental report on May 8, 2014, based on additional history provided to him by Mary Adcock. Ms. Adcock reported that McCullough had been fired from the company. She reported he was highly distractible and his behavior at work was highly questionable. She cited several instances where he cursed customers and cursed her. She told Thomas that but for the family relationship McCullough would have been terminated sooner. She told the doctor that the family had tried to find a job he could do, but he continued to have difficulty interacting with others. He was given a job in maintenance, but had a propensity to burn things, not remembering instructions that burning was not legal because the company was located within the city limits.

Thomas considered Adcock's history to confirm his theory that family accommodation explained McCullough's employment history. He opined that McCullough's work-place behavior would make other employment likely to be short-lived. Because the report from Adcock related to work in the 1990's, Thomas found the history was indicative that McCullough had had problems functioning in a work environment for a long time.

(a) Dr. Joe Edward Morris

Dr. Morris, a psychologist, performed his evaluation of McCullough on November 7, 2014, and like Thomas found evidence that McCullough was mentally retarded. His report was submitted to the Appeals Council after the ALJ's first decision. McCullough presented with a

dull affect and passed the malingering test.  He found McCullough put forth good effort on testing and it "seemed important to him to do as well as he could.  Often, he would ask 'How well did I do?'"

Though McCullough drove himself to the doctor's office, the directions were repeated to him five times.  He had great difficulty comprehending even simple directions, despite being familiar with surrounding landmarks.  These problems with comprehension continued through testing.  Some of McCullough's answers were not responsive to the questions asked. Morris noted both parents were deceased and that his mother had been diagnosed with dementia.

McCullough told this doctor he had graduated from high school and gotten a degree from community college.  He told Morris he may have been special-education at one point. Morris noted McCullough's claim to have worked at the Tupelo Coliseum from 1997 to 2002 before being laid off, but the doctor suspected he lost the job due to inability to interact appropriately with co-workers.

Morris noted McCullough's basic communication and social skills, but still found that others would have difficulty carrying on a conversation with him.  He had some trouble completing sentences.  He reported very little social life, though his demeanor was noted to be very sociable.  McCullough reported that his sister had moved to Italy, but he never visited her because it was too far to drive.  He said he watched television regularly but could not recall anything he had seen within the last twenty-four hours.  He claimed to attend church and read his Bible but could not remember anything he had read recently.  McCullough reported he could use the telephone without assistance and drive short distances, but could not drive to Jackson, Mississippi alone.  Though McCullough told him that he managed his own finances, Morris found this claim unbelievable based on test results.

Morris found McCullough was oriented in all spheres and had no indication of anxiety or depression.  He found that his thoughts were generally connected and logical, but sometimes tangential.  McCullough had difficulty starting, as well as completing sentences. There was some inconsistency because McCullough could be articulate at times, and at other times was struggling to find a simple word to fit in the sentence.  Instructions frequently had to be repeated though the doctor stressed that McCullough did not present as malingering.  The testing showed a full-scale IQ of 52, a finding in the upper limits of a moderate mental retardation.

Because McCullough was his sole historian, Morris, relying on the educational history, found the testing results would "represent a significant decrease[] from premorbid levels of functioning."  In achievement testing, McCullough read at a 2.4 grade level; comprehended sentences at grade 3.6, spelled at grade 5.5, and could do math at a 4.6 grade level.  On the Stanford Benet Intelligence Scale, McCullough was functioning at a mental age of 9, with an IQ of 55.

In his conclusions, Morris found McCullough's test results reflect cognitive functioning "significantly below what one would expect considering that he has a high school diploma and possibly no special education."  He stressed the problems McCullough had with memory and his continuing difficulty following simple instructions.  Morris noted that he did not present with other significant psychological issues.  Even with simple instructions, there was a need to repeat them.  He thought McCullough's cognitive problems would make it very difficult for him to respond appropriately to supervision or to interact with co-workers.  He noted his concentration and attention were markedly affected.  He found that he was significantly impaired cognitively and would not be able to perform even routine, repetitive tasks on a sustained basis for a

reasonable length of time.  He thought McCullough was either suffering from mental retardation or early onset dementia.

## C.  HEARING TESTIMONY

There have been two hearings in support of McCullough's application and the testimony in both is relevant to this action.

In the first hearing, McCullough testified that he attended Tupelo High School to the tenth grade and left school because he could not get along with other people.  He had last worked with Lift, Inc., in 2008 doing janitorial work for a few months.  He had also worked, on an as needed basis, with Cole Entertainment Service loading and unloading truck for concerts and other shows.  He had also worked with Tupelo Coliseum in operations setting up stages, meeting rooms, banquet rooms and wedding reception facilities.  His work hours varied at that job.

He testified he had a stroke in 1996 which caused weakness on the right side of his body.  He also suffered a serious injury to his left leg in 2006, a friction burn of his calf and ankle.  He testified standing on the left leg would cause it to swell and hurt.

He testified that he had emotional problems which resulted in reprimands at work.  He could not follow directions to drive himself to Jackson, MS, but did his own shopping with a list.  He could lift his grocery bags one at a time with his left hand.  He could not lift a gallon of milk with his right hand.  He testified his right leg dragged some because of the stroke.  He lived alone but did not go out and socialize with friends.  His idea of "going out" was running to the store or picking up a hamburger at McDonald's.  He swept his floors, did his own laundry, and could drive a little.  He said he attended church on Sundays but reported some pain on prolonged sitting due to the stroke.

Mary Connor Adcock, his first cousin and a supervisor at the family business, testified McCullough would "go off" on people without provocation. He worked with her both at McCullough Steel, and at her business, Flowerdale. Once when he was doing some cleaning at her business, she asked him to move to another area so she could attend to customers. McCullough, in front of customers, picked up his mop and threatened to "beat the hell out of" her. Another time, when McCullough was helping her in the yard, a builder came up to him and was, without provocation greeted by McCullough picking up a shovel and threatening to beat the man with the "expletive" shovel. Yet another time one of his co-workers quickly intervened in a heated verbal altercation between McCullough and a customer, because it looked like McCullough was about to punch the customer. Adcock verified at the hearing that the information she provided Dr. Thomas about McCullough's behavioral problems and his intellectual limitations was accurate. She testified "he just can't function with people." His behavior was the reason he was fired from McCullough Steel.

In addition to problems with other people, Adcock testified that McCullough had great difficulty in following instructions and performing even simple tasks. He could only follow the most basic instructions, such as having a specific item pointed out to him and being told to take it to "so and so" at the warehouse. He handled "very menial" work around the warehouse. She recalled how she thought it was funny when she first started working at the family business that her father had it written out that it was his job responsibility to water the rocks in a gravel area to keep down the dust because of the trucks coming and going from the business. She testified McCullough deteriorated some physically after his stroke. McCullough handled his most basic needs like grocery shopping, but her brother, Glen McCullough, Jr. handled some of his finances as his "guardian or something is the way my grandmother had it set up."

Glenn McCullough Jr., another of his cousins, appeared at the first hearing and was prepared to testify about McCullough. After the ALJ stated that, "I understand that he's handling the claimant's finances and that sort of thing," McCullough was not called to testify.

The ALJ at the hearing asserted that "I can't look at anything past the date last insured." After his counsel pointed out the report from Dr. Thomas that covered McCullough's cognitive limitations, the ALJ again reiterated that he only had records from 2006 (the left leg injury) and that any impairment would be from that injury. This indicated as his decision later showed, that he would not look at the evidence of the earlier stroke either, though the records were in the administrative file.

In lieu of making a second appearance, his cousins each submitted affidavits regarding his physical and mental conditions and work experience. The affidavits provided they had both known McCullough all his life and that they maintained contact and communication with him for many years including at least from 2009 through the present day. They both affirmed reviewing the Dr. Joe Morris' report and stated McCullough's limitations were consistent with Morris' report from at least 2009 through the present; and that McCullough's report to Dr. Morris that he graduated from Tupelo High School and from a community college was not accurate, but reflective of his mental limitations. They thought McCullough may have later earned his GED, but he dropped out of high school, and did not attend college, except to pursue a GED. Adcock noted his only past work was manual labor. She noted that "Boyce has in the past worked for McCullough Steel Products from time to time in jobs that require manual labor, but he was unable even with the family business to maintain uninterrupted employment because of behavioral issues."

McCullough testified at the second hearing that his janitorial work at Lift, Inc., included emptying trash cans twice a day and making sure the restrooms had tissue and paper towels twice a day. He moved copy paper on request from the back to the front office, using a cart to move the paper. He also spot-cleaned windows. The heaviest thing he lifted at that job would've been about fifteen pounds. The ALJ asked no further questions of McCullough at this second hearing, devoting the remainder of the hearing to questioning the vocational expert.

4. <u>THE ALJ'S DECISIONS</u>

In the original decision, the ALJ found the claimant's sole medically determinable impairment was a friction burn to his left lower extremity and a left lower extremity injury. McCullough suffered a friction burn/laceration over his left leg. Other than eschar (dead tissue expected to slough off), an examining orthopedist thought the Achilles tendon would be exposed. He required therapy to deal with a flexion contracture and was referred to a plastic surgeon, Dr. Robert Buckley, for a possible skin graft. The wound over his tendon eventually healed some six to seven months later. The ALJ found that the impairment did not significantly limit the ability to do basic work activities for the twelve-month duration required to qualify for benefits.

Consistent with his statements made in the hearing, the ALJ never mentioned Thomas' report on McCullough's cognitive deficits nor the earlier medical evidence of McCullough's stroke.

In his second decision, the ALJ decided at the second step, that, as of the date last insured, the plaintiff's severe impairments were left leg injury, friction burn to the left lower extremity, and status post cerebrovascular accident with right leg spasticity.[2] The plaintiff was

---

[2] While the ALJ's decision reflects some of the confusion in the medical record with the spasticity sometimes noted to be on the left and at other times on the right, the step two determination specified that the spasticity problem was on McCullough's right side, which is also consistent with McCullough's testimony.

treated by a neurologist, Mark Fletcher, beginning in 1997, for a suspected lunar infarction of the left thalmus. This stroke caused weakness and spasticity in the upper and lower extremities.

McCullough also suffered an injury to his left leg and ankle in 2006, from a friction burn that caused a laceration above his Achilles tendon. This injury did not heal for several months and resulted in referral to a plastic surgeon. The ALJ noted his doctor released McCullough without restrictions after skin reformed to cover the Achilles tendon.[3] His treating orthopedist submitted a report after the DLI, finding limitations from the injury before the DLI.

The ALJ decided that the plaintiff's cognitive impairments were not shown to be severe as of the date last insured at the end of March 2009, though the testing and evaluations were done in 2013 and 2014. He reviewed McCullough's medical history, including records of his physical impairments. The ALJ's decision noted that aside from a reference to childhood meningitis "the record is void of any evidence concerning diminished cognitive function, but the defendant was nevertheless evaluated by Dr Brian Thomas, a neuropsychologist in May 2013."[4]

The ALJ's decision notes the claimant advised Thomas of the earlier stroke and the resulting right-sided weakness. McCullough also told Thomas he had never been fired from a job; never taken psychotropic medication or had other mental health treatment. McCullough, the ALJ found, possessed basic communication and social skills and reported he "only" attended special education in the fourth and fifth grades and did not repeat any grades before quitting school in the tenth grade. In spite of his basic social skills, he would stutter and forget to end his

---

[3] It was the plastic surgeon, not the treating orthopedist, who released him without limitations.
[4] This finding ignores McCullough's testimony about dropping out of school, attending special education, his inability, at school and at work, to get along with people; his cousin's testimony about his behavior with supervisors, co-workers and customers; his very limited ability to perform even simple work functions at the family business; and his inability to sustain employment with family businesses, in spite of substantial accommodations.

sentences.  The ALJ mentioned that the doctor administering the intelligence testing found results indicative of mental retardation but failed to mention the specific result—a full-scale IQ of 62.  Thomas, the ALJ said, found the testing reflected McCullough's present intellectual functioning, but gave the report weight only as demonstrating his "functional abilities as of May 2013."  The ALJ found the report provided no evidence the cognitive impairments existed prior to the date last insured.  In fact, the ALJ said Thomas "made no reference whatsoever to claimant's past mental abilities or limitations beyond the 10th grade education history, employment in excess of 17 years, lack of psychiatric treatments, and the fact that he had never been fired from a job." [5]

He also rejected a supplemental report by Thomas, in which Thomas opined that Adcock's history confirmed his suspicions that most of McCullough's work history was attributable to family accommodation.  The ALJ found that Thomas' opinion was not supported because Adcock's statements about McCullough's history were, in his opinion, entitled to minimal weight.  The ALJ discounted her affidavit for not indicating whether she worked with McCullough, before or after the cerebrovascular accident and for not providing sufficient details about the duration and frequency of interaction with the plaintiff. [6]  He found the limitations she described were uncorroborated and unsupported by the medical evidence in the record.  Since her testimony and affidavit related almost exclusively to intellectual capacity and behavioral

---

[5] This is at best a limited reading of Thomas' report, since nothing in the report suggests recent onset.  Thomas says McCullough is mentally retarded, a life-long impairment, by definition, which may have been worsened either by childhood meningitis or by a stroke twelve years before his date last insured.

[6] The ALJ at several points looked to the timing of the stroke which, based on the medical records, had no cognitive impact on McCullough.  While the interest shown in the stroke by the psychologists and a neurologist, Dr. Oakes, as a potential source of his cognitive and or other mental difficulties is logical, the records of treatment show only physical impairments from the stroke.

issues, apparently the ALJ was rejecting her testimony due to the lack of contemporaneous IQ testing and dismissing the *post hoc* IQ testing.

The ALJ also discussed the November 2014 report done by Dr. Morris. The ALJ noted that McCullough said he graduated from high school and obtained a degree from community college. He noted McCullough attributed his loss of employment at the Coliseum in 2002 to a lay-off, and Morris' suspicion that it may have been triggered by McCullough's behavioral issues. The ALJ noted his reported activities of daily living included bathing and dressing independently, making his bed, and washing his dishes. McCullough reported he became occasionally confused and had trouble staying on track. He claimed he read his Bible and attended church regularly but could not recall anything he had read recently. The ALJ noted Morris found the intellectual testing results were suggestive of intellectual functioning in the moderate range of mental retardation, but again did not mention the specific test result—a full scale IQ of 52. The ALJ noted that Morris found McCullough's test results were significantly lower than what would be expected for a claimant who possessed a high school diploma. He noted Morris felt the plaintiff met the criteria for dementia. The ALJ noted Morris "specifically declined to provide an etiological basis for the claimant's dementia or mild mental retardation" and that he did not provide a chronological correlation between the claimant's dementia or mild mental retardation and any other event or condition as of the date last insured. As such, the ALJ afforded Morris' report with minimal weight as it relates to his mental condition and/or limitations as of the date last insured."

<u>ANALYSIS</u>

<u>When is Reversal of Cases Appropriate?</u>

In this case, the court must decide whether to remand the case, as the Commissioner requests, or reverse the decision and award benefits.  By statute, the district courts have authority to reverse the decisions of the Commissioner, with or without remanding for further administrative proceedings.  42 U.S.C § 405 (g). The decision to remand a case or to reverse the case and award benefits is addressed to the discretion of the court.  *Wilson v. Barnhart,* 284 F.3d 1219, 1217(11th Cir. 2002).

Typically, erroneous decisions are remanded for further consideration., and reversals, with an award of benefits are the exception. *Newton v. Apfel*, 209 F. 3d 448, 452(5th Cir. 2000). The court will consider the length of time a claim has been pending; the completeness of the record; the strength of the evidence showing the applicant is disabled; and any failure to follow instructions or mandates of a court following appeal.  *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (Case remanded after eight years).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence", the courts may reverse without remand. *Vitek v. Finch,* 438 F.2d 1157-1158 (4th Cir. 1971)([T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the Secretary's  findings, and that his conclusion is rational); *Breeden v. Weinberger,* 493 F.2d. 1002, 1012 (4th Cir. 1974)(No remand is necessary where the record lacks substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose.); *Jimmerson v. Apfel*, 111 F. Supp. 2d 846, 850-851(E.D. Tex. 2000)(Where a case had been remanded twice, and the decision was still not supported by substantial evidence, it would be reversed not remanded.).

"A judicial award of benefits is proper only where the proof of disability is overwhelming, or where the proof of disability is strong and the evidence to the contrary is lacking."  *Haynes v. Colvin*, 2015 WL 3964783, *3 (W.D. Tex. June 29, 2015).  The law also recognizes that the Social Security Administration cannot be allowed to litigate claims *ad infinitum. Shelton v. Astrue*, 2011 WL 1234910, *3 (E.D. Tex. 2011) ("While courts express themselves differently—sometimes colorfully—the core rationale seems to be that the Commissioner is not entitled to limitless opportunities to repair the record.")  Though the critical factor is the strength of the evidence of disability, this court looks first at the other factors to be considered.

Under the best of conditions, the administrative process is complicated and time-consuming and the delays intrinsic in the process can impose severe privations on deserving applicants.  Where the process is particularly extended, and where more than one appeal becomes necessary, the courts must consider the impact of further delay when the claimant appears to be deserving.   In *Malone v. Social Security Administration,* 2015 WL 3964783, *3 (N.D. Miss. May 3, 2016) this court reversed and remanded benefits on a second appeal where substantial evidence supported an award of benefits, and the claim had been pending for four years.  In another case, *Cork v Astrue*, Civil Action No. 1:11-cv-144-DAS, when the case came before the court a second time and the court found for a second time that evidence from a treating physician had been improperly rejected, the decision was reversed.  Cork's claim had been pending over four years at that time.

Like the plaintiffs in *Malone* and *Cork*, this is McCullough's second appeal.  In both stints in administrative proceedings, it should have been obvious the documented IQ scores could not be ignored merely because of the date on the reports.  Nevertheless, the testing was not

examined the first time around. With the IQ scores and a claim of mental retardation the ALJ was obliged to do a step three analysis under *Audler v. Astrue,* 501 F.3d 446 (5th Cir. 2001). He failed to perform this analysis either time he had the case before him. The court, therefore, finds that the length of time the present action has been pending and the failure to correct earlier errors both favor reversal.

The court also notes that the Commissioner has not suggested the record needs to be reopened or that additional evidence is needed. The court cannot imagine there is further pertinent information. These factors also favor reversing the Commissioner's decision — if the evidence in support of McCullough's claim is strong enough to justify an award of benefits.

Because the sole issue remaining issue is whether the evidence in the record compellingly and overwhelmingly demonstrates that McCullough meets Listing 12.05, the court's decision comes down to a limited number of sub-issues.

## Meeting the 12.05 Listing

Every plaintiff must meet the definitional requirements of the Listing, commonly called the capsule definition and one of the four severity prongs to qualify for benefits. But assuming McCullough meets the capsule definition, he unquestionably meets the required severity prong in the Listing. If McCullough's IQ of 52, as found by Dr. Morris, is used he meets paragraph B of the Listing. If the slightly higher IQ of 62 found in Thomas' testing is accepted, McCullough must also show that he has or later acquired a "physical or other mental impairment imposing an additional and significant work-related limitation." 12.05(C).[7] The ALJ's step two finding that

---

[7] Paragraph C is designed to recognize that individuals with IQs between 60 and 69 may have the capacity to perform and maintain employment, despite intellectual and adaptive limitations, while recognizing that their compromised capacity to work makes them more vulnerable to becoming disabled, if they have or develop additional impairments. *Durden,* 586 F. Supp.2d at 837. *King v. Barnhart*, 2007 WL 9687746 (S.D. Ind. Feb 26, 2007).

McCullough suffered severe impairments secondary to the stroke and leg injury satisfies the second part of paragraph C. *Lucky v. Health and Human Services*, 890 F.2d 666, 669 (4th Cir. 1989). Because the severity prong is met, the court turns to the question of whether the capsule requirements are met.

Meeting the Capsule Definition

As noted above, Listing 12.05 requires every claimant to meet the definition of mental retardation -- the capsule definition. The capsule definition is met when the evidence shows the claimant has significantly subaverage intellectual functioning and deficits of adaptive functioning that manifested in the developmental period. To have "manifested in the developmental period" the evidence must "demonstrate[] or support[] onset before the age of twenty-two."

In this circuit, the plaintiff must offer some proof that deficits in adaptive functioning existed before that birthday. *Randall v. Astrue*, 570 F. 3d 651 (5th Cir. 2009). This definitional requirement is part of the 12.05 analysis because IQ tests are subject to measurement error that may overstate or understate intellectual functioning. To account for this potential measurement error and to assure that the IQ results are valid, the Listing calls for consideration of an individual's level of functioning. *See, Moore v. Quarterman*, 342 F.Appx 65 (5th Cir. 2019). Psychologists and other medical experts consider and evaluate the individual's "[a]ctivities includ[ing] activities of daily living, such as cleaning, shopping, taking public transportation, paying bills, maintaining a residence, and attending to grooming and hygiene and using telephones and the post office." Listing 12.00(C)(1). The Fifth Circuit, quoting the American Association on Mental Retardation, found that mental retardation, in addition to involving significantly subaverage intellectual functioning, required a showing of "limitations in two or

more of the following applicable skills areas: communication, self-care, home living, social skills, community use, self-direction, functional academics, leisure and work." *Morris v. Dretke*, 413 F.3 484, 487 (5th Cir. 2005).

<u>Standards for Analyzing IQ Tests</u>

Given McCullough's IQ test results, the multiple functional deficits documented in the unrebutted reports by Thomas and Morris, and the ALJ's finding that he also suffers from severe physical impairments, there cannot be serious doubt that McCullough is disabled now. The court's decision, therefore, hinges on a question of strength of the evidence of the onset of the severe subaverage intellect and deficits in functioning.

The ALJ refused to give any meaningful credit to the experts' reports of McCullough's IQ and to their reports of his deficits, as having any bearing on McCullough's IQ and assessing his condition before the dates of testing and evaluation. In doing so, the ALJ failed to recognize the reality that IQ's usually remain stable over long periods of time, and that absent evidence of an intervening cause, it is safe to presume that IQ test results obtained today will reflect intellectual functioning for years, even decades into the past. The ALJ failed to recognize and apply this presumption in his analysis of McCullough's IQ and other functioning. [8]

Many circuits, including the Eleventh Circuit, have employed a rebuttable presumption that a later IQ test, so long as valid, is proof of IQ during the developmental period. *Hodges v. Barnhart,* 276 F.3d 1265 (11th Cir. 2001); *Grant v. Astrue*, 255 Fed. Appx. 374, 375 (11th Cir. 2007) (In the absence trauma or other explanation for a later decline in IQ, the ALJ errs in

---

[8] There has been no suggestion that the tests scores obtained by Thomas and Morris are not valid.

requiring the claimant to prove retardation began before the 22nd birthday.); *Talavera v. Astrue*, 697 F.3d 145, 152 (2nd Cir. 2010) (Absent evidence to the contrary it is reasonable to assume that a claimant's IQ will be fairly constant throughout their lives.) *Luckey v. U.S. Dept. of Health & Human Services,* 890 F.666, 28 Soc. Sec. Rep. Serv. 12 (4th Cir, 1997) (Finding that mental retardation is a lifelong condition, most typically beginning at birth and later tests may be used as evidence of mental retardation at an earlier time). *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006); *Muncy v. Apfel,* 247 F.3d. 728, 734 (8th Cir. 2001).

Even in circuits that do not presume that adult IQs are necessarily indicative of developmental IQs, the courts do not require production of IQ tests performed before reaching adulthood. *Cortes v. Commissioner of SSA,* 255 F. Appx 646, 652-53 (3rd Cir. 2007) (Other evidence, such as dropping out of school or struggling to obtain a GED supports developmental onset of intellectual disability.) Nor is it necessary to have been formally diagnosed with mental retardation before the age of 22. *King,* 2007 WL 968746 at * 5.

While the Fifth Circuit has not directly addressed this presumption, it has in *Copeland v. Colvin*, 771 F. 3d 920 (5th Cir. 2011), in dicta, approvingly cited the *Hodges* case that did adopt this presumption, noting "[r]ebuttable presumptions that may favor a claimant exist in other areas of Social Security Law." But see, *Ledet v. Colvin*, 2016 WL 3079026 (May 3, 2016 E.D. La. 2016)(Interpreting *Copeland* as not adopting the ruling in *Hodges).* Even without a definitive holding from the Fifth Circuit, some courts in this circuit, including our own, have employed a rebuttable presumption that an IQ test obtained after the age of twenty-two is proof of IQ before that age. *Durden v Astrue*, 586 F.Supp.2d 828 (S.D. Tex. 2008).

In *Sims v. Astrue*, 2010 WL 2985818, at *5 (N.D. Miss. July 27, 2010), this court, citing *Hodges, supra,* held that absent evidence of trauma that could cause mental retardation, a valid

IQ test created a rebuttable presumption of a fairly constant IQ through the life of a claimant. It also noted a person may not, for a variety of reasons be tested before reaching adulthood, but that does not indicate that the individual was not mentally retarded during the developmental years. Citing *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985). See also, *Guzman v. Bowen*, 801 F.2d 273, 276–75 (7th Cir.1986) (presumption that low IQ existed before first IQ test).

Evidence of Onset

The court, therefore, finds that the ALJ should have started his analysis of McCullough's cognitive deficits with the presumption that McCullough's intellectual functioning had been stable over his life. Because the same evidence will reflect on whether McCullough suffered deficits in adaptive functioning in his youth and whether his IQ has been stable, the court addresses the evidence concerning both issues together.

McCullough suffered bacterial meningitis as a child. This medical history offers one possible cause for his intellectual disability and would indicate childhood onset. The record also shows that McCullough was placed in special education for at least two years and possibly for four years, facts also supporting childhood onset of intellectual disability. This kind of performance in school is not only an important indicator of subaverage intelligence but it is an important indicator of deficits in adaptive functioning before age 22, as "[f]unctional academic skills is the primary measure of deficits of adaptive functioning before" that age. *Salmons v. Astrue*, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012) (Plaintiff dropped out in the ninth grade, was in special education classes, was "taught the basics" so he could pass the grade and had difficulty reading and writing but can do most "basic math.") Not only was McCullough in special education, he testified that he dropped out of school, adding to the evidence of academic

dysfunction.[9]  While his cousins' testimony and affidavits address a later time in his life, their testimony, regarding his low intellectual functioning at work is consistent with McCullough's testimony and academic record.  Furthermore, in spite, of attending school for at least nine years, the achievement tests all placed his abilities in lower to mid-elementary grade levels, further suggesting academic failure before age 22.

The court also notes that there was substantial evidence to show McCullough was limited in his ability to handle his own finances.  At the first hearing Adcock testified that her brother handled most of McCullough's finances in accordance with some type of guardianship started by a grandparent — not a typical financial arrangement for an adult with a normal intellect.  The ALJ accepted the tender that Glen McCullough would have testified to handling most of McCullough's finances for him.  This additional area of adaptive deficits, though not directly tied to his childhood and youth, might well exist in youth but not be detected until the time came to assume this adult responsibility.  Inability to handle his own finances is consistent with his academic record and the achievement testing.  In fact, Dr. Morris stated that he found McCullough's claim that he handled his own finances incredible because of the objective proof of his lack of the necessary skills and abilities.

McCullough's testimony about his problems with social functioning leading to his dropping out of school, again corroborated by his cousins' testimony about his continuing later inability to interact appropriately with other people as an adult, demonstrates significant deficits in social functioning.  His testimony is also consistent with many of the findings in the experts' reports years later, including social isolation.  In short, while the record may not show that

---

[9]  The ALJ resolved the discrepancy about the educational history in finding he had a limited education, which by definition means that he had at least a seventh-grade education, but no more than an eleventh grade education.

McCullough had significant adaptive deficits in *all* areas of functioning, the evidence overwhelmingly shows that he suffered significant deficits in several areas adaptive functioning and that the deficits manifested before age 22 as required in the capsule definition. The record shows McCullough with his IQ results and deficits in adaptive functioning in two areas meets the criteria for mental retardation found in *Morris v. Dretke,*. 413 F.3d 484, 487 (5th Cir. 2005).

The court acknowledges the length of McCullough's work history, and the ALJ's emphasis on that history, but finds, both because all his work was unskilled and because most of it was done with the benefit of accommodations due to family connections, this evidence fails to refute the proof of his significant deficits, nor does it rebut the presumption that his IQ results reflect his earlier IQ. The ability to perform, even maintain, work at unskilled levels is not necessarily inconsistent with mild mental retardation or proof of the absence of adaptive deficits. *Durden*, 586 F. Supp. 2d at 838. ([A]n individual with Mild Mental Retardation may manage to hold an unskilled job despite her intellectual limitations, but when faced with an additional physical impairment, be unable to work, as recognized by Listing 12.05(C)).

Adcock testified in considerable detail to McCullough's struggles to perform even the simplest of job tasks and the frequent severe disruptions caused by his inability to interact with others appropriately. She confirmed both that the family provided him with substantial accommodations at work and that family ties did not stop them from ultimately firing McCullough. The ALJ chose to look at the length of the work relationship but disregard the actual history of his employment, including the fact that the family's repeated attempts to accommodate McCullough ultimately failed. The history of his work demonstrates rather than refutes deficits in adaptive functioning in a work environment. Using the length of McCullough's employment with his family as indicating a capacity to sustain work and as cause

to reject the claim of intellectual disability, without considering the extent to which the work was performed in a sheltered, not competitive environment, is not reasonable. The content of his work history "fairly detracts from the weight" of the length of that history. *Universal Camera Corp.* 340 U.S. 488.

The court also rejects any suggestion that being able to do his laundry, sweep his floors, buy his groceries or do some limited driving constitutes substantial evidence to reject the IQ results, nor can these basic ADL's outweigh the profound and more closely work-related deficits shown in the record regarding McCullough's inability to interact appropriately at work; his struggle to perform even the simplest work tasks; and his inability to handle his own finances.

The court finds additional error because the ALJ both took great pains to discount the testimony of McCullough's cousins, offering contradictory and clearly erroneous reasons for doing so, then contradicted himself in relying on their testimony in assessing McCullough's RFC, ultimately giving their evidence more than the slight weight he assigned.

The ALJ rejected the evidence offered by both cousins and discounted Thomas' report because he relied in part on Adcock's history. He gave the Thomas report no weight prior to the 2013 examination date. It also appears the ALJ committed error by missing Adcock's earlier testimony completely, since nothing in the testimony is mentioned in his decision. The ALJ found that neither of the cousins had adequately described the nature of their contact with McCullough and therefore discounted their reports of his impairments. In the face of her testimony at the first hearing, this is not a valid basis for discounting Adcock's testimony. Furthermore, the ALJ discounted the cousins' affidavits, both for failure to demonstrate enough familiarity with McCullough to provide valuable information and for family bias though he failed to determine the degree of kinship. This is not the first time the court has heard either of

these two explanations for discounting testimony, but it is the first time the court has heard both explanations directed at the same evidence.

The ALJ also committed error in deciding to discount Adcock's affidavit because it failed to disclose whether her work experience with McCullough was before or after his 1996 stroke. But as stated earlier, the stroke treatment records offer no suggestion that the stroke had any effect other than right-sided spasticity and weakness. Because the stroke is immaterial to the evaluation of his intellectual abilities and the medical records offer no evidence that it triggered any decline in his intellect, when Adcock worked with McCullough vis-à-vis his stroke is immaterial.

The court finally notes that notwithstanding his rejection of the evidence from McCullough's cousins, and the resulting rejection of Dr. Thomas' report, the ALJ's assessment of McCullough's RFC indicates he in fact gave their input more than minimal weight. The ALJ found that McCullough was limited to receiving and understanding simple oral instructions and providing simple information and to performing only simple, repetitive tasks. He found McCullough could only interact occasionally with supervisors and co-workers but never with the public. These findings are grounded in the reports of McCullough's cousins and Dr. Thomas. Likewise, finding these restrictions in the RFC is largely inconsistent with the step two determination that McCullough was not suffering from any severe intellectual disability on or before his DLI.

Other evidence in the record corroborates the lay testimony in the case. McCullough worked for his family for seventeen years, but his unstable employment history after leaving the family business lends credence to the claim that his family provided him with a sheltered work environment and that he needed substantial accommodation to sustain work. He continued to

work on an as-needed basis with one employer for a few years, but his wage record, after leaving his family employer is littered with multiple jobs over the remainder of his work life, with most of the jobs earning him less than one thousand dollars, and one job at Wal-Mart yielding what was clearly less than a single day's wages.

The evidence causing the greatest pause for the court in considering remand is one portion of Dr. Morris' report. Morris found McCullough suffered from mental retardation — a diagnosis consistent with his school and work history. But Morris' report also suggests McCullough might be suffering from early onset dementia. If this is true McCullough might have experienced some decline in his IQ as an adult. The ALJ discussed the report, but he ignored factual problems underlying Morris's suggestion of early dementia as a possible explanation for the IQ findings. Morris noted a substantial discrepancy between McCullough's history of having graduated from high school and/or junior college and the IQ test results that are inconsistent with that level of academic achievement. Morris was searching for a possible explanation for this high "premorbid" functioning claimed by McCullough, and the inconsistent test results.

What the ALJ knew and determined was that the educational history given to Morris was inaccurate and therefore McCullough's level of academic achievement in school was not inconsistent with the IQ results. While not mentioning McCullough's "true" educational history in his review of Morris' report, the ALJ ultimately found that McCullough had a limited education, which is defined by regulation to include attendance in school through at least the seventh grade, but not further that the eleventh grade. 20 C.F.R. § 404.1507(d). This factual determination by the ALJ, undermines the reason Morris suspected the possibility of a decline in IQ as an adult. With the factual basis for Morris' suspicion removed, any suggestion that

McCullough's IQ declined as an adult is no more than speculation and does not rebut the presumption that McCullough has had a significantly subaverage intellect his entire life based on his test results. Considering the record, as a whole, the court finds that substantial, compelling and overwhelming evidence supports finding McCullough meets the Listing 12.05 (C) and that he should have been deemed disabled at step three. There is no substantial evidence to support denying McCollough's claim.

## Conclusion

The court finds that the motion of the Commissioner to remand this action for further administrative proceedings should be and it is denied. The decision of the Commissioner is reversed and rendered. The court finds that William Boyce McCullough was disabled as of the alleged date of onset. This action is remanded for calculation of benefits. A separate judgment will be entered.

This the 27th day of February, 2019.


/s/ David A. Sanders
U.S. MAGISTRATE JUDGE